UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Criminal Action No. 1:24-cr-10060-IT |
| | * | |
| Kirk Wilson, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

March 28, 2025

TALWANI, D.J.

Defendant Kirk Wilson is charged with being felon in possession of firearm, in violation of 18 U.S.C. § 922(g). Indictment at 1 [Doc. No. 1]. He seeks an order suppressing the firearm and ammunition seized from his person on December 14, 2023, on the grounds that the search violated his Fourth Amendment rights. For the following reasons, Defendant's Motion to Suppress [Doc. No. 45] is DENIED.

I.   Background Based on the Motion to Suppress Record

On December 14, 2023, at approximately 12:30 a.m., Defendant was driving on Route 495 North from Ayer, Massachusetts, towards Portland, Maine. Wilson Aff. ¶¶ 2-3 [Doc. No. 45-1]. He was fatigued and exited Route 495 to find a place to pull over and sleep before continuing his travels. Id. ¶ 3.

At 1:17 a.m., Sergeant Edmund Bussiere of the Littleton Police Department was travelling west on King Street in Littleton when he saw a stopped vehicle. See Bussiere App. for Crim. Compl. at 3 [Doc. No. 49-1]; Bussiere's Arrest Report at 4 [Doc. No. 49-2]. No brake lights were on. See Bussiere App. for Crim. Compl. at 3 [Doc. No. 49-1]; Bussiere's Arrest Report at 4 [Doc. No. 49-2]. Bussiere states that the vehicle was parked in the travel lane of King

Street, see Bussiere App. for Crim. Compl. at 3 [Doc. No. 49-1]; Bussiere's Arrest Report [Doc. No. 49-2] at 4, while Defendant maintains that it was parked safely alongside a dark road off of King Street, see Wilson Aff. ¶ 4 [Doc. No. 45-1]. Bussiere states that "vehicle lights" were on, see Bussiere App. for Crim. Compl. at 3 [Doc. No. 49-1]; Bussiere's Arrest Report [Doc. No. 49-2] at 4, while Wilson states that the parking lights were on, see Wilson Aff. ¶ 4 [Doc. No. 45-1].

Bussiere approached the vehicle and observed a male alone in the vehicle in the driver's seat. Bussiere's Arrest Report at 4 [Doc. No. 49-2]. Bussiere knocked on the window several times to get Defendant's attention. See id. Defendant was startled awake by the pounding and did not immediately recognize the person pounding as a police officer. See Wilson Aff. ¶ 5 [Doc. No. 45-1]. Defendant appeared to Bussiere to be "dazed and confused" and was "unable to open the window." Bussiere's Arrest Report at 4 [Doc. No. 49-2].

Bussiere opened the door and was hit by the smell of "fresh burnt marijuana." He also observed a "small joint on the center console." Id. Bussiere reported that Defendant had "bloodshot glassey eyes" and that his speech was "thick/mumbled," and Bussiere was unable to understand anything that Defendant was trying to say. Id. Bussiere states that he asked Defendant to present his license and registration, and that Defendant continued to mutter and stare at Bussiere. Id. Defendant states that the officers asked him repeatedly for his license and registration. See Wilson Aff. ¶¶ 6-7 [Doc. No. 45-1]. Defendant also started reaching into his pockets. Bussiere's Arrest Report at 4 [Doc. No. 49-2]; Wilson Aff. ¶ 6 [Doc. No. 45-1].[1] Bussiere told him several times to stop reaching. Bussiere's Arrest Report at 4 [Doc. No. 49-2].

---

[1] Defendant contends that he was reaching for his identification but does not claim that he told Bussiere that. See Wilson Aff. ¶ 6 [Doc. No. 45-1].

2

Bussiere states that he asked Defendant to exit the car and had to assist Defendant out of the vehicle. Id. Defendant states that he was continuing to try to reach in his pocket for his identification when Bussiere physically removed him from the car. See Wilson Affidavit ¶ 7 [Doc. No. 45-1]. Once outside the car, Defendant continued to look "unsteady" to Bussiere and was unable to stand on his own. Bussiere's Arrest Report at 4 [Doc. No. 49-2].

Defendant continued to reach into his right jacket pocket even after Bussiere told him numerous times to stop. Id. Officer Sorensen, who arrived as backup, saw the two outside the car and heard Bussiere telling Defendant not to reach in his pocket. See Sorenson's Arrest Report at 6 [Doc. No. 49-2].

Bussiere patted the outside of Defendant's pocket and detected the shape of a firearm. Bussiere's Arrest Report at 4 [Doc. No. 49-2]. Defendant was then handcuffed, and Bussiere reached into Defendant's pocket and pulled out a Taurus 22-caliber handgun that had eight rounds of ammunition. Id.

The vehicle was then searched, and pill bottles were found containing Topiramate and Gabapentin pills with another individual's name on the pill bottle. Id.

Defendant was transported to the Littleton Police station, where Bussiere assisted him out of the vehicle and to the booking area. Id. Bussiere states that Wilson continued to not follow instructions at the booking area. Id. After some time, Defendant became more alert and identified himself as "Kirk Wilson." Id. He stated that he was on his way back home to Portland, Maine, that he had stopped to have a "smoke," and that he was confused about where he was and did not remember where he parked the vehicle. Id. at 5. The registry showed that he had a suspended driver's license, and officers located no license to carry a firearm or possess ammunition. Id.

Defendant was charged with operating under the influence of drugs, unlicensed operation, possession of class E drugs, possession of a firearm, and possession of ammunition. Id.

On March 7, 2024, a federal grand jury returned an indictment charging Defendant for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g). Indictment at 1 [Doc. No. 1].

Defendant now moves to suppress the firearm and ammunition seized from his person on December 14, 2023. He contends that the search was not supported by a reasonable suspicion that he was armed and dangerous, as required for a valid Terry frisk.

## II.     Fourth Amendment Claim

Defendant argues that Bussiere's decision to pat-frisk and search Defendant violated Defendant's Fourth Amendment rights. See Mem. ISO Mot. to Suppress at 3 [Doc. No. 46].

*A.     Legal Framework*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief investigatory stops generally known as Terry stops." United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016) (quoting United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011)). "An officer may ordinarily execute a Terry stop without running afoul of the Fourth Amendment if the officer 'reasonably suspects that the person apprehended is committing or has committed a crime.'" Id. (quoting Camacho, 661 F.3d at 726). Reasonable suspicion "need not amount to probable cause," but nonetheless must be "more than a hunch." United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011) (citing Terry v. Ohio, 392 U.S. 1, 22 (1968)).

"[I]n determining whether a pat-down search is an appropriate step following a valid Terry stop, the key is whether, under the circumstances, the officer is justified in believing that

4

the person is armed and dangerous to the officer or others." United States v. Belin, 868 F.3d 43, 49 (1st Cir. 2017) (internal quotations omitted) (quoting United States v. Cardona-Vicente, 817 F.3d 823, 827 (2016). "To assess the legality of a protective frisk, a court looks at the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion." Id. (quoting Cardona-Vicente, 817 F.3d at 827).

Further, "police officers who patrol the public highways are often called to discharge noncriminal community caretaking functions." Caniglia v. Strom, 593 U.S. 194, 196 (2021) (internal quotations omitted). These functions include "investigat[ing] vehicle accidents in which there is no claim of criminal liability," Cady v. Dombrowski, 413 U.S. 433, 441 (1973), and providing "aid [for] those in distress, combat[ing] actual hazards, prevent[ing] potential hazards from materializing[,] and provid[ing] an infinite variety of services to preserve and protect public safety." United States v. Rodriguez-Morales, 929 F.2d 780, 784-85 (1st Cir. 1991). Such actions are not subject to the Fourth Amendment's warrant requirement. See id. at 785. This is true even when an officer engaging in a community caretaking function "may also have been motivated by a desire to investigate crime." United States v. Coccia, 446 F.3d 233, 241 (2006).

    *B.*    *Discussion*

The parties do not dispute that Bussiere was authorized to approach the Defendant's vehicle as a community caretaking function. See Mem. ISO Mot. to Suppress at 11 [Doc. No. 46]. The Defendant disputes, however, whether Bussiere's knocking on the window and ordering the Defendant to exit the vehicle were permitted under the community caretaking function. See id. at 12.

"In community caretaking cases, as elsewhere, reasonableness has a protean quality." Rodriguez-Morales, 929 F.2d at 785. Reasonableness is the ultimate inquiry a court must make

5

in determining whether an officer's actions are permissible. Id. Here, as in other cases, an officer who notices a car on the side of the road may approach it and knock on its window. See, e.g., Caniglia, 593 U.S. at 198 (noting officer can take actions private citizens might do); United States v. Lee, 2018 WL 3873668, at *4 (D.R.I. Aug. 15, 2018) (collecting cases where community caretaking permitted knocking on car window); United States v. General, 237 Fed. Appx. 808, 810 (4th Cir. 2007) (asserting knock on car window by officer consensual when inquiring if driver needed aid).

A slightly different issue arises with Bussiere's opening of the Defendant's door. While the community caretaking exception does "not necessarily or invariably turn on the existence of 'less intrusive' means," Illinois v. Lafayette, 462 U.S. 640, 647 (1983), courts "cannot overlook the myriad [of] less intrusive paths available" to law enforcement officers when engaging in caretaking tasks. See United States v. Morgan, 71 F.4th 540, 545 (6th Cir. 2023). Again, the ultimate standard is reasonableness, a fact-based determination. See Rodriguez-Morales, 929 F.2d at 785 (quoting South Dakota v. Opperman, 428 U.S. 364, 375 (1976)).

Bussiere's opening of the Defendant's door was a reasonable function of the community caretaking exception. The Sixth Circuit has noted that "[c]oncerns about the health of a driver by themselves generally do not permit the unannounced opening of a car door." See Morgan, 71 F.4th at 545. Here, however, Bussiere did announce himself before opening the door by knocking on the window several times. See Wilson Aff. ¶ 5 [Doc. No. 45-1]. Only when Bussiere noticed that Defendant was "dazed and confused" and seemed "unable to open the window" did Bussiere open the door. Bussiere's Arrest Report at 4 [Doc. No. 49-2]. Even if Bussiere's first words to Defendant were not those expressing concern for his health or safety,

6

Bussiere took the reasonable step that would have been required prior to potentially giving Defendant aid: opening Defendant's door.

Once the door was opened, Bussiere smelt "fresh burnt marijuana," and observed a "small joint on the center console." Id. These facts provide the reasonable suspicion necessary to convert the community caretaking stop into the policing action of a traffic stop. See Rodriguez v. United States, 575 U.S. 348, 355 (2015) (requiring reasonable suspicion to extend traffic stop). Once the traffic stop began, Bussiere was permitted to ask for Defendant's identification and command that Defendant step out of the car. See United States v. Dion, 859 F.3d 114, 125 (2017); Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977).

The government argues that Bussiere had a reasonable suspicion that Defendant was armed and dangerous because Defendant was "found in the middle of the night, was visibly impaired, and continued to reach for his pocket after receiving" instructions to stop. See Gov't Opp. at 8 [Doc. No. 49]. The government cites United States v. Harrington, in which the court considered a "mosaic of factors" to conclude that a frisk was justified where the officer observed the suspect passed out in the vehicle, where the vehicle was in a high-crime area, where the suspect appeared to be under the influence of opioids, and, "most notably," where the individual "reach[ed] for something inside the vehicle" multiple times and, "when asked to place both hands on top of his head," did not comply and reached towards his pocket. 56 F.4th 195, 199, 204 (1st Cir. 2022) (internal quotations omitted).

For his part, Defendant maintains that Defendant's apparent "furtive gestures"—namely reaching towards his jacket pocket—did not justify a reasonable suspicion that Defendant was armed and dangerous. See Mem. ISO Mot. to Suppress at 6 [Doc. No. 46]. In United States v. McKoy, the court held that a frisk was not justified even where officers believed the

7

neighborhood where a suspect was parked was a high-crime area and where the suspect appeared nervous, avoided eye contact, and made movements toward the center console of his car as officers approached. 428 F.3d 38, 40-41 (1st Cir. 2005). The court explained that because "[n]ervousness is a common and entirely natural reaction to police presence," and because the suspect's reaching movement toward the center console was consistent with reaching for a driver's license or registration, such action, even in a high-crime area, did not justify a frisk. Id.; cf. Belin, 868 F.3d at 50 (frisk justified where an individual appeared "unusually nervous" and was suspected of being in unlawful possession of a firearm).

Neither Harrington nor McKoy dictate an outcome here. Factors that Harrington considered in determining that a frisk was justified, such as the nature of the crime the defendant was suspected of committing or the officer's perception that the defendant was parked in a high-crime area, are absent here. This case is also distinct from McKoy because the trial court in McKoy made no finding that the defendant had failed to comply with officers' orders not to reach for the center console, see United States v. McKoy, 402 F. Supp. 2d 311, 313 n.2 (D. Mass. 2004), whereas Defendant here was repeatedly told not to reach for his jacket pocket.

This court finds that Defendant's repeated failure to comply with orders not to reach for his jacket pocket, when viewed in light of the totality of the circumstances, was sufficient to justify a reasonable suspicion that Defendant was armed and dangerous. See United States v. Williams, 39 F.4th 1034, 1042 (8th Cir. 2022) (finding a pat-down search justified because the defendant's "nervousness, combined with his repeated reaching towards his front pocket despite [the officer's] commands not to, gave rise to reasonable suspicion that he might be armed and presently dangerous."). While Bussiere's report portrays Defendant as under the influence of drugs or alcohol rather than nervous or aggressive, that distinction does not diminish the risk

8

posed by Defendant's repeated noncompliance with the officer's orders, grounding a reasonable suspicion that Defendant was reaching towards his jacket pocket to access a weapon, such that the frisk was justified.

### III. Inevitable Discovery

The government sets forth an alternative ground for admitting the firearm and ammunition seized in the search: the inevitable discovery doctrine. Evidence that "would inevitably have been discovered without reference to the police error or misconduct" may be admitted at trial. United States v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011) (quoting Nix v. Williams, 467 U.S. 431, 448 (1984)). Such evidence is admissible "so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." Id. (quoting United States v. Zapata, 18 F.3d 971, 979 (1st Cir. 1994)). Here, the firearm and ammunition would have been inevitably discovered upon the Defendant's arrest.

Of the three prongs, Defendant disputes only the first, arguing that there was not probable cause for Defendant's arrest. See Def.'s Reply at 1 [Doc. No. 54]. An arrest is supported by probable cause when "a reasonably prudent person would believe the suspect had committed or was committing a crime" in light of "reasonably trustworthy facts and circumstances." United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997). The existence of probable cause is assessed by viewing the "totality of the circumstances," United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000), and is based on "what the officer knew at the time of the arrest." United States v. Brown, 169 F.3d 89, 91 (1st Cir. 1999) (emphasis added). Probable cause does not require "evidence sufficient to convict the individual, but merely enough to warrant a reasonable belief that he was engaging in criminal activity." United States v. Link, 238 F.3d 106, 110 (1st Cir. 2001) (citation

9

omitted). While a higher bar than reasonable suspicion, the officer's conclusion need not be "ironclad, or even highly probable," but only "reasonable." Finamore v. Miglionico, 15 F.4th 52, 59 (1st Cir. 2021) (quoting United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999)).

Defendant argues that there was not probable cause to arrest the defendant for Operating Under the Influence ("OUI"). Defendant does not dispute that he was under the influence of drugs at the time of the arrest. Defendant's main argument concerns whether there was probable cause to find that Defendant operated his vehicle while impaired, where the car was parked when the officer arrived. See Def.'s Reply at 1 [Doc. No. 54].

The Massachusetts Supreme Judicial Court has held that an individual "operates" a motor vehicle within the meaning of M.G.L. c. 90, § 24, "when, in the vehicle, he intentionally does any act or makes use of any mechanical or electrical agency which alone or in sequence will set in motion the motive power of that vehicle." Commonwealth v. Ginnetti, 400 Mass. 181, 183, 508 N.E.2d 603 (1987) (quoting Commonwealth v. Uski, 263 Mass. 22, 24, 160 N.E. 305 (1928)). Defendant posits that "[h]aving a key in the on position appears to be the minimum required factor" of an OUI offense. See Def.'s Reply at 2 [Doc. No. 54]; Commonwealth v. Sudderth, 37 Mass. App. Ct. 317, 321, 640 N.E.2d 481 (1994) (affirming OUI conviction of intoxicated driver with key in ignition and engine running); Commonwealth v. McGillivary, 78 Mass. App. Ct. 644, 645-647, 940 N.E.2d 506 (2011) (affirming OUI conviction of intoxicated driver with key in ignition and the car's electricity on but engine off). Defendant argues that since nothing in the record indicates that the key was inserted or the engine was running, the mere fact that the vehicle's lights were on was not sufficient for a reasonable officer to believe that the vehicle was in operation. See Def.'s Reply at 3 [Doc. No. 54]. Defendant contends that "the key had not remotely activated the motive power of the vehicle functioning" when officers

10

came upon his vehicle, id. at 3 n.2,² and that turning or keeping on one's headlights on does not amount to an intentional act setting in motion the motive power of the vehicle, id. at 3.

In a recent decision, however, the Massachusetts Court of Appeals found sufficient for a conviction "the radio [being] on, from which the jury could reasonably infer that the van's electrical components were engaged. There was therefore sufficient evidence of operation." Commonwealth v. Wurtzberger, 104 Mass. App. Ct. 558, 562, 241 N.E.3d 749 (2024), review granted, 495 Mass. 1106, 250 N.E.3d 540 (2025). The court need not enter this nuanced legal debate as to whether lights on are sufficient for an OUI offense where Bussiere had probable cause to believe that Defendant had been operating his vehicle under the influence to reach the spot at which his car was parked. See Commonwealth v. Hilton, 398 Mass. 63, 68, 494 N.E.2d 1347 (1986) (upholding OUI conviction based on evidence that defendant had operated the vehicle under the influence prior to officers discovering her inside a parked car). Defendant was in the driver's seat, and there was no other passenger in the car when Bussiere arrived. Thus, it would have been reasonable for an officer to conclude that Defendant, and not someone else, drove the car to the location where it was parked.

The only remaining question is timing. Defendant was not parked in a private driveway or in a parking lot, which might suggest that Defendant had parked for the night. Instead, the car was parked close to the highway exit ramp, suggesting that Defendant had pulled off the highway. And when Bussiere arrived, the car's headlights were on, suggesting that Defendant had not been parked for an extended length of time, and Defendant was significantly impaired,

---

² See Commonwealth v. Altshuler, 68 Mass. App. Ct. 1112, at *3 (2007) (characterizing argument that "certain technological advances, including the availability of remote starters, have created an ambiguity with respect to the term 'operation'" as a "novel one").

11

making likely that he had ingested drugs to cause impairment while still driving. Based on these facts, Bussiere had probable cause to find that Defendant had operated his vehicle while impaired to reach the location where the vehicle was stopped.

Finally, as the government notes in its opposition and Defendant does not dispute in his reply, Bussiere also had probable cause to arrest Defendant for driving a vehicle on a suspended license. See Gov't Opp. at 10 n.3 [Doc. No. 49]; see also Bussiere's Arrest Report at 5 [Doc. No. 49-2] (charging Defendant with, inter alia, unlicensed operation).

As to the second prong of the inevitable discovery doctrine, the police had policies that would have led to the search of the Defendant, and discovery of the firearm and ammunition, after his lawful arrest for OUI or driving on a suspended license, making discovery inevitable. See Gov't Opp. at 9-10 [Doc. No. 49]. As to the third prong, Defendant makes no argument that the application of the inevitable discovery doctrine here will "encourage police misconduct or significantly weaken Fourth Amendment protections," see Hughes, 640 F.3d at 441, and the court does not find that to be a concern here.

Therefore, even if the pat-frisk of Defendant was unlawful, suppression would not lie.

## IV.   Conclusion

For the foregoing reasons, Defendant's Motion to Suppress [Doc. No. 45] the firearm and ammunition is DENIED.

IT IS SO ORDERED.

March 28, 2025                    /s/ Indira Talwani
                                  United States District Judge